## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | |
|---|---|
| RUSSELL G. OLIVER, | |
| Plaintiff, | Civil Action No.: 2:21-cv-62 |
| v. | |
| COASTAL REGIONAL COMMISSION OF GEORGIA, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Russell G. Oliver and brings this action pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended, the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*., and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* Plaintiff alleges that Defendant Coastal Regional Commission of Georgia subjected him to discrimination based on Plaintiff's disability, including harassment and failure to provide a reasonable accommodation, subjected Plaintiff to retaliation after he engaged in protected activities, and failed to properly pay overtime wages, respectfully showing as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331, 1343, & 1391 and the enforcement provisions of the Americans with Disabilities Act, 42 U.S.C. § 12117, the Rehabilitation Act of 1973, and the Fair Labor Standards Act, 29 U.S.C. § 216.

2.

Venue is proper in this judicial district and the division of this Court because the events underlying this action, occurred in McIntosh County, Georgia, which is located in this judicial district and division, pursuant to 28 U.S.C. § 1391, 42 U.S.C. § 2000e-5(f)(3), and the Rules of this Court.

**PARTIES**

3.

Plaintiff Russell G. Oliver (hereinafter, "Plaintiff" or "Oliver") is a citizen of the United States and a resident of Georgia.

4.

At all times relevant times, Mr. Oliver was considered a covered, non-exempt employee under the Americans with Disabilities Act, the Rehabilitation Act, and the Fair Labor Standards Act.

5.

Defendant Coastal Regional Commission of Georgia (hereinafter, "Defendant") is a regional commission created and recognized under the laws of the State of Georgia. O.C.G.A. § 50-8-32. Defendant is considered a public agency and instrumentality of its members. *Id.* Defendant may be served by delivering a copy of the Summons and Complaint to its chief executive officer pursuant to O.C.G.A. § 9-11-4(e)(5).

6.

Defendant has employed in excess of fifteen employees, working for at least 20 calendar weeks in 2020 and preceding years. Defendant is a covered employer within the meaning of the Americans with Disabilities Act.

7.

Defendant receives federal grants of assistance and otherwise contracts with the federal government, and Defendant is therefore a covered employer under the Rehabilitation Act.

8.

Defendant is a covered enterprise pursuant to the Fair Labor Standards Act.

**STATEMENT OF FACTS**

9.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 8, as if the same were set forth herein.

10.

Mr. Oliver began his employment with Defendant in September 2015.  Most recently, Mr. Oliver served as a Senior Planner II.  As a Senior Planner II, it was Mr. Oliver's responsibility to coordinate and provide services to local governments, design websites, conduct transportation planning, provide community outreach and education, and facilitate trainings concerning planning.

11.

Mr. Oliver met the knowledge, education, skills, experience, and license requirements for his position.  Mr. Oliver has a bachelor's degree in Landscape Architecture from Clemson University, a master's degree in Environmental Planning & Design from the University of Georgia, and has gained over a decade of planning and design experience with much of that occurring in the coastal region of Georgia.

12.

Mr. Oliver served in the position of Senior Planner II for over five years, and at all relevant times his performance was exemplary.

13.

Mr. Oliver was qualified for his position and able to perform the essential functions of his job.

14.

Frequently, Mr. Oliver's position required for him to travel, attend conferences, presentations, and meetings with Defendant's member counties, and perform work outside of Defendant's standard business hours.

15.

As a result, Mr. Oliver generally worked more than 40 hours in each workweek during his tenure.

16.

Defendant was aware that Mr. Oliver was working in excess of 40 hours per workweek because it reimbursed travel expenses, assigned or approved Mr. Oliver's attendance at conferences and meetings, and Mr. Oliver frequently sent after-hour emails to his supervisors.

17.

However, Mr. Oliver was not compensated at rate equivalent to one-and-a-half times his hourly rate when he worked in excess of 40 hours per week.

18.

Mr. Oliver suffers from underlying physiological disorder that has contributed to Mr. Oliver experiencing morbid obesity.  For individuals like Mr. Oliver, morbid obesity is a physical impairment that results in spatial limitations due to a person's size and weight, decreased stamina and fatigue, overall weakness, and difficulty with walking and mobility. This medical condition is also a direct cause of other medical conditions, such as sleep apnea, which causes Mr. Oliver to

have difficulty sleeping, and high blood pressure. As a result, morbid obesity severely limits Mr. Oliver's ability to perform major life activities.

19.

Morbid obesity also causes an increased risk of other health problems such as diabetes, stroke, heart disease, and certain cancers. Individuals with morbid obesity have been identified by the Centers for Disease Control and Prevention as having a higher risk of developing serious complications if infected by the COVID-19 virus.

20.

In March 2019, Mr. Oliver's supervisor, Planning & Government Services Director Eric Landon (hereinafter, "Director Landon"), provided Mr. Oliver with positive ratings on his performance evaluation, and the supervisor raised the possibility of Mr. Oliver soon receiving a promotion.

21.

However, Mr. Oliver did not hear anything else concerning a promotion, and when he followed up with Director Landon in June, September, and December 2019, Director Landon would either ignore the question or indicate that he was working on it. When Mr. Oliver followed up in September 2019, Director Landon mentioned that Mr. Oliver had arrived late to work a few times over the last month, to which Mr. Oliver explained had been the result of his sleep apnea. Either way, Director Landon told Mr. Oliver not to worry.

22.

Finally, when Mr. Oliver followed up about the promotion in December 2019, Director Landon said that he changed his mind and had decided not to move forward.

23.

Around the same time coworker Hunter Key told Mr. Oliver, "you know, sometimes, I just want to punch you in the face."  This was not the first time that this individual made such a comment, and Mr. Oliver had previously asked the coworker not to make or even joke about such a threat.

24.

Mr. Key was not known to make these types of comments to Mr. Oliver's coworkers who did not have a disability.

25.

When Mr. Oliver reported Mr. Key's comment to his supervisor on December 30, 2019, Director Landon said not to worry about those types of comments because Mr. Key was just acting like a big brother.

26.

In the same conversation, Director Landon handed Mr. Oliver a document entitled "Performance Discussion," which addressed the fact that Mr. Oliver had been late three times over a four-month period.

27.

In response, Mr. Oliver reminded Director Landon that Mr. Oliver had notified him in advance of being late to work on one of those occasions.

28.

Mr. Oliver once again explained that his sleep apnea and difficulty sleeping caused by his medical condition cause Mr. Oliver to be late to work on rare occasion.  Director Landon responded

that there are other people with "medical conditions," but that they are able to make it to work on time.

29.

Director Landon said that he only mentioned the tardy arrivals for Mr. Oliver's benefit, and that other than this issue, Mr. Oliver was doing fine.  Later that day, Director Landon repeated the fact that Mr. Oliver should not worry about the discussion.

30.

Despite Mr. Oliver's complaint, the same coworker threatened to punch Mr. Oliver in the face again in February 2020.

31.

In March 2020, the global pandemic caused by the COVID-19 virus began to have noticeable impacts on many people's lives.  On March 14, 2020, the Governor of the State of Georgia issued an Executive Order declaring a public emergency due to the virus.  The Governor issued several more Executive Orders over the subsequent days, including one on March 16, 2020, closing public schools, a "shelter-in-place" order for individuals considered high risk on March 23, 2020, and a state-wide "shelter-in-place" order on April 2, 2020.

32.

On March 16, 2020, Mr. Oliver approached Director Landon to discuss specific concerns that he had concerning COVID-19 based on his medical condition.  When Mr. Oliver asked that he be permitted to telework, Director Landon said that he could submit his request to Defendant's Executive Director Allen Burns (hereinafter, "Executive Director Burns").  Director Landon said that Executive Director Burns would be available to speak the following day.

33.

Director Landon told Mr. Oliver not to mention his request to work from home so no other employees would make a similar request.

34.

On March 17, 2020, Mr. Oliver had not heard anything from Executive Director Burns about his request to telework, so Mr. Oliver went to see Executive Director Burns in his office. When Executive Director Burns asked what medical conditions he had that required telework, Mr. Oliver explained that he was considered high risk because of his obesity, high blood pressure, and other chronic conditions.

35.

Executive Director Burns responded saying that the number of COVID-19 cases were declining. Mr. Oliver explained that this was inconsistent with the most recent numbers reported by the Georgia Department of Public Health.  Mr. Oliver further stated that he did not feel safe in the workplace because of his health conditions that cause him to be at high risk.

36.

Executive Director Burns denied Mr. Oliver's request to telework, saying, "I'm sorry, but if I let employees work from home because they are at high risk, I'd have to let half of the folks in the building work from home."

37.

Mr. Oliver responded by suggesting that he could use his personal computer while at home, and that there would not be any disruption to Mr. Oliver's work.

38.

Executive Director Burns responded, "well not all employees are fortunate like you.  I'm sorry, but I can't allow telework for you."

39.

Because his request to telework was denied, Mr. Oliver requested to take time off instead.

40.

Mr. Oliver also asked Executive Director Burns to notify him if telework were later approved or permitted while he was on leave.

41.

But for Executive Director Burns denial of Mr. Oliver's request to work from home, Mr. Oliver was otherwise able to perform his job through telework.  However, since the request was denied Mr. Oliver was forced to use his paid leave from March 18, 2020 through March 26, 2020.

42.

Mr. Oliver returned to the office on March 30, 2020 at 6:50 am.  Later that morning, Executive Director Burns saw Mr. Oliver in his office and said "well, it's about time you got here," which was an apparent reference to the leave that Mr. Oliver had taken, instead of the time he arrived at work that day.

43.

Mr. Oliver did not respond to the comment, instead asking Executive Director Burns again if he was considering telework as an option.  Executive Director Burns said that he was not.

44.

During this conversation, Mr. Oliver also advised Executive Director Burns that Mr. Oliver had been invited to present at the American Society of Landscape Architects conference in October

2020.  But when Mr. Oliver shared this information, Executive Director Burns told Mr. Oliver that he would not be able to attend the conference.

45.

When Mr. Oliver asked why the request was being denied, Executive Director Burns responded, clearly mocking Mr. Oliver, "Ooooh, I've got health conditions!  I can't do anything!"

46.

Mr. Oliver did not respond to this comment, and Executive Director Burns immediately appeared to realize that his comment was not appropriate.

47.

The tone of the Executive Director's comment was akin to the infamous incident when a presidential candidate mocked the appearance of a New York Times reporter with a physical disability at a campaign rally on November 24, 2015.

48.

Mr. Oliver was not the only person who felt that the Executive Director's comment was inappropriate because, later that day, a coworker who had overheard the comment asked Mr. Oliver why Executive Director Burns said what he did.

49.

Later that afternoon, Director Landon approached Mr. Oliver and said that Defendant was allowing telework beginning the next day, March 31, 2020.

50.

On March 31, 2020, most of Defendant's employees were working from home.  During a virtual meeting, Director Landon asked if anyone had any issues to report, and Mr. Oliver used this opportunity to ask that Defendant allow him to bring home the chair from his office.

51.

Defendant had previously provided Mr. Oliver with an office chair designed to support a higher weight limit due to Mr. Oliver's medical condition.

52.

Director Landon told Mr. Oliver that he did not think this would be possible, but that he would submit the request to Executive Director Burns.  Director Landon later told Mr. Oliver that he would not be permitted to take the chair home.

53.

Critically, it would not have caused Defendant an undue hardship to allow Mr. Oliver to take the chair home while he was out teleworking.

54.

Without having an appropriate chair for computer and office work at home, Mr. Oliver was at a higher risk of workplace injuries, and it caused interference with Mr. Oliver's ability to perform the essential functions of his job.

55.

When Defendant denied Mr. Oliver's request to take the specially-ordered chair home while teleworking, Defendant failed to present any alternatives or otherwise engage in the interactive process.

56.

The next day, April 1, 2020, Mr. Oliver sent an email to a coworker to see if she could recall the model number of the chair from when it was initially ordered, but Mr. Oliver did not receive a reply.  Mr. Oliver then sent a text to another coworker who was still working in the office,

asking him to check the model number.  That coworker responded with the model number soon thereafter.

57.

However, the next day, Mr. Oliver received an email from Director Landon, criticizing Mr. Oliver for asking his colleagues about the chair.  Director Landon said that, if the lack of a comfortable chair did not allow Mr. Oliver to work from home, then "maybe we should consider using [personal time off]" while Mr. Oliver was away.

58.

In response to the email, Mr. Oliver tried to explain that he was asking about the chair, not so that he could take it from the office as he previously requested, but so that Mr. Oliver could order the same chair with his own funds to use at home.  Director Landon responded that he wanted the conversation to stop and that "[w]e all have to make sacrifices."

59.

By early May 2020, Defendant began indicating to its employees that everyone would be required to return to the office, and Mr. Oliver had to advise his immediate supervisor that on April 30, 2020, the Governor had extended and renewed the Public Health State of Emergency until June 12, 2020.  Mr. Oliver also explained how his health concerns necessitated that he continue to work from home, and he provided excerpts and a link to guidance from the Centers for Disease Control and Prevention on the issue.

60.

After Mr. Oliver provided Director Landon with a copy of the most recent Executive Order, Director Landon responded approving Mr. Oliver for telework through June 12, 2020.

61.

On June 2, 2020, Mr. Oliver sent a similar email to his supervisor, advising that the Public Health State of Emergency had been extended again, and requesting that his approval to telework be extended.

62.

Director Landon respond that he had reviewed the Executive Order and that "vulnerable populations" were permitted to travel to and from their employment at that time.  Director Landon further stated that they did not see anything in the Executive Order extending the ability to work from home after the April 30, 2020 Order expired on June 12, 2020.

63.

Defendant neither provided, nor had, a legitimate business reason for denying Mr. Oliver's request to continue teleworking or for saying that Mr. Oliver needed to be physically present in the office.

64.

Several days later, Mr. Oliver repeated his request to extend telework, and he attached a note from his medical provider in support of this request.

65.

On June 8, 2020, Director Landon responded by saying that everyone was expected to be back in the office on Monday, June 15, 2020.  Director Landon also said that Mr. Oliver could return to work, or he could use paid time off if Mr. Oliver were still concerned about the risk to his health.  If Mr. Oliver chose to take leave, he would be required to return all of Defendant's equipment by June 11, 2020.

66.

Mr. Oliver responded to the email, stating, "[w]hat I have provided you is a doctor's note requesting reasonable accommodation to continue tele-work.  If that is unreasonable, I would like the opportunity to discuss FMLA or other disability leave with [Defendant's] HR/Benefits support."

67.

Just over one hour later, Executive Director Burns, who had been copied on emails between Mr. Oliver and Director Landon, responded to Mr. Oliver by repeating Director Landon's early email nearly verbatim.

68.

On June 9, 2020, Mr. Oliver spoke to Human Resources Assistant Chrishonda Grant (hereinafter, "HR Assistant Grant") to explain what had occurred with the denial of his request for a reasonable accommodation.

69.

Mr. Oliver only spoke to HR Assistant Grant because, as it was explained to Mr. Oliver, Human Resources Director Colletta Harper (hereinafter, "HR Director Harper") was working from home as a result of an injury to her back.

70.

Upon information and belief, Defendant approved HR Director Harper's request to telework because of her medical condition without the same initial denials, excuses, or difficulty that Defendant had subjected Mr. Oliver.

71.

In addition to explaining what had occurred with the denial of his request for a reasonable accommodation, Mr. Oliver asked for information concerning FMLA leave, and HR Assistant Grant asked for more information concerning Mr. Oliver's prior complaints of harassment from Executive Director Burns and his coworkers and Director Landon's earlier denial to bring his office chair home. HR Assistant Grant asked why Mr. Oliver had not raised these concerns with HR previously, and Mr. Oliver explained that he was afraid that it would have caused additional problems.  HR Assistant Grant said that she would follow up.

72.

The concern that Mr. Oliver shared with HR Assistant Grant about his complaints turned out to be legitimate.

73.

The next day, June 10, 2020, HR Assistant Grant sent an email to Mr. Oliver explaining that his request to extend telework was denied.  She further advised Mr. Oliver to return all of Defendant's equipment the next day and provide any documentation in support of a request for FMLA leave to HR.

74.

On June 11, 2020, Mr. Oliver submitted a request for FMLA leave and he returned his equipment to Defendant.

75.

On the same day, Defendant cut off Mr. Oliver's access to email and Microsoft Teams.

76.

Mr. Oliver called the IT Analyst to figure out why he was locked out, and the IT Analyst said that Director Landon and Executive Director Burns directed him to disable Mr. Oliver's electronic access.

77.

On June 15, 2020, Executive Director Burns sent a text to Mr. Oliver, advising him that telework was going to be permitted, and asking Mr. Oliver to provide a doctor's note supporting the fact that Mr. Oliver's medical condition caused him to be considered high risk.  The two also coordinated the time in which Mr. Oliver would pick up the equipment and supplies that he had been asked to drop off the previous Thursday.

78.

When Mr. Oliver returned to work the next day, he found that Director Landon had removed Mr. Oliver from the Microsoft Teams page for Mr. Oliver's department.

79.

On the same day, Mr. Oliver sent an email to Executive Director Burns attaching the new note from Mr. Oliver's physician that Defendant requested.

80.

In several emails that followed over the course of two hours, Executive Director Burns insisted that Mr. Oliver's doctor's note was insufficient, legally, because it did not state Mr. Oliver's specific diagnosis.

81.

Executive Director Burns is not a trained or licensed attorney, and he has not received any training concerning the sufficiency of documentation provided by an employee in support of a request for a reasonable accommodation under the Americans with Disabilities Act.

82.

Mr. Oliver then raised concerns that Executive Director Burns was invading Mr. Oliver's privacy into his medical information, but Mr. Oliver said that someone from human resources could follow up with his physician to get more information.

83.

A week later, Executive Director Burns had still not responded to Mr. Oliver's request for clarification.   As a result, Mr. Oliver called HR Assistant Grant to seek clarification on what additional information Defendant needed from his doctor.   Mr. Oliver also raised his concerns about Executive Director Burns asking for more medical documentation, and he explained that he thought it was more appropriate for those questions to come from human resources.

84.

During this conversation, Mr. Oliver learned that Executive Director Burns had apparently failed to provide Mr. Oliver's doctor's note to human resources.

85.

HR Assistant Grant advised Mr. Oliver to have his medical provider fill out an FMLA certification and have it on file, even if Mr. Oliver did not need FMLA leave at that time.

86.

Mr. Oliver also learned during this telephone call that he was the only one working from home, and HR Assistant Grant chuckled when Mr. Oliver said that this must mean that all eyes were on him.

87.

The next day, Mr. Oliver followed up with HR Assistant Grant, asking for her to send the correct FMLA forms since she had not done so week earlier. Later that day HR Director Harper sent the FMLA forms, and Mr. Oliver completed and returned them the following Monday.

88.

On June 30, 2020, Mr. Oliver received a request from one of Defendant's member counties, asking for Mr. Oliver to build a website since he had done so well on a previous project.  When Director Landon found out about this project, Director Landon took the project from Mr. Oliver and reassigned it to a coworker who had no experience building websites.

89.

On July 1, 2020, Defendant issued a policy entitled "Required Telework Procedure," which required employees who were teleworking to keep a running log of their work, log in to Defendant's system using a virtual private network ("VPN"), and check in with supervisors three times per day.

90.

Since Mr. Oliver was the only employee regularly teleworking, the new telework policy was developed for and applied solely him.

91.

On July 8, 2020, Mr. Oliver learned from a coworker that someone had packed up all of Mr. Oliver's belongings in his office and placed them into boxes.

92.

On July 15, 2020, Director Landon asked Mr. Oliver if he intended to come into the office since the current shelter-in-place order was expiring soon.  Mr. Oliver responded, saying that it was his understanding that the order would indeed be extended, and asking for his leave to be extended. Director Landon told him to submit a request to have telework extended, and to submit a request for leave under the Emergency Paid Sick Leave Act if the request is not approved.  Mr. Oliver reminded Director Landon that he had not received a response to his FMLA paperwork that he had submitted the prior month.

93.

The next month, Mr. Oliver found out from a coworker that Defendant had sent several of its employees home to work remotely due to possible COVID-19 exposure and infection. Defendant intentionally kept this information from Mr. Oliver, and the employees who were sent home were not subjected to the Required Telework Procedure.

94.

Soon thereafter, Mr. Oliver was speaking to the IT Analyst about a personal matter via telephone.  The IT Analyst was shocked to learn that Mr. Oliver was being required to log in each day with a VPN, and he expressed concern for Mr. Oliver's well-being and the way things had been going in the office.

95.

Previously, Mr. Oliver had responded to press inquiries about some of his work projects. However, on September 2, 2020, when a journalist sought information concerning a regional project for which Mr. Oliver had received a national award, Executive Director Burns refused to grant Mr. Oliver approval to respond to the reporter's questions.

96.

On September 8, 2020, Director Landon asked Mr. Oliver to change his vacation plans because Director Landon wanted to take off the same week.  Director Landon also asked Mr. Oliver to cover for him while he was out.

97.

Even though Mr. Oliver's position had previously required for him to interact and communicate with officials with state agencies, Director Landon issued a reprimand to Mr. Oliver on September 10, 2020, for contacting the Georgia Department of Community Affairs without first getting Director Landon's permission.  However, the two men had discussed the issue the prior day, and Director Landon knew that Mr. Oliver was looking into it and was going to contact the agency.

98.

That afternoon, before leaving for vacation, Director Landon set his out-of-office email notice, which advised anyone needing immediate assistance to contact two individuals in other departments.  Director Landon had made Mr. Oliver change his vacation plans so he could cover for Director Landon during his absence, yet the out-of-office message made no reference to Mr. Oliver.

99.

Several months earlier, Mr. Oliver had made initial contact with the Savannah Local Office of the Equal Employment Opportunity Commission (hereinafter, "EEOC"). On September 18, 2020, Mr. Oliver returned the Form 5 Charge of Discrimination that the EEOC had been prepared for him.

100.

On September 21, 2020, the EEOC sent notice to Defendant's human resources department of Mr. Oliver's Charge of Discrimination.  The notice provided that Mr. Oliver was claiming discrimination based on disability, including harassment and intimidation and failure to provide a reasonable accommodation, from December 2019 through the present.

101.

In pertinent part, Mr. Oliver's Charge of Discrimination specifically referenced Mr. Key's harassment, being mocked about his disability by Executive Director Burns, and the difficulty that Mr. Oliver had getting approval to telework and how Defendant was intentionally placing burdensome requirements on Mr. Oliver and undue scrutiny as a result.

102.

On or about October 14, 2021, Defendant submitted its written Position Statement concerning Mr. Oliver's Charge of Discrimination to the EEOC, which was drafted by Executive Director Burns.

103.

Even though Executive Director Burns stated that Mr. Oliver had disclosed that he has Class III obesity, he argued that Mr. Oliver had not claimed that he had a disability because he had not disclosed the underlying medical condition that caused his obesity.

104.

In the Position Statement, Executive Director Burns responded to the allegation that he had mocked Mr. Oliver about his disability when denying his request to attend a conference by admitting that he made the "snide remark" in an open area of the office.

105.

Executive Director Burns did not deny Mr. Oliver's allegation that he had complained about the actions and behaviors to Defendant.  Instead, Executive Burns responded that Mr. Oliver had not followed Defendant's policies for complaints for harassment and discrimination.

106.

Executive Director Burns acknowledged that Mr. Oliver had discussed his accusations with HR Assistant Grant.

107.

Executive Director Burns presumably tried to excuse Defendant's failure to address Mr. Oliver's concerns when he stated that HR Assistant Grant had been working for Defendant for less than one year when Mr. Oliver had complained.

108.

Executive Director Burns also acknowledged that Mr. Oliver's initial requests to telework were denied, and that Mr. Oliver was told to take personal time off instead.

109.

Executive Director Burns noted that the documentation prepared by Mr. Oliver's physician only stated that Mr. Oliver was at high risk of COVID-19 due to his obesity, but that the paperwork did not say that Mr. Oliver had a disability.

110.

Once again, Executive Director Burns insisted that Defendant did not have proof that Mr. Oliver had a "disability" as defined by the EEOC.

111.

In the Position Statement, Executive Director Burns blamed all of Defendant's actions and inactions on COVID-19 and the changing landscape and protocols as a result of the virus.

112.

Finally, Executive Director Burns was apparently offended by the fact that Mr. Oliver was claiming that he had been discriminated or retaliated against.

113.

As the Executive Director wrote, "[Defendant] has been in operation since 1964 and has never had a claim against it.  We follow our Policies and Procedures in our Employee Handbook and treat all [sic] our employees the same."

114.

Defendant's employees were not normally expected to work on Fridays.

115.

One of Mr. Oliver's former supervisors reached out to Mr. Oliver to ask if he could participate in a presentation to the National Oceanic and Atmospheric Administration on Friday, November 20, 2020.  This presentation was one that Mr. Oliver had initially helped the former supervisor develop back in 2018 as a part of his job duties.

116.

Mr. Oliver agreed to and participated in the virtual presentation, and Mr. Oliver's portion lasted less than one minute.

117.

Mr. Oliver did not spend any time while he was on the clock to prepare for the presentation.

118.

Mr. Oliver did not spend any time while he was on the clock to participate in the presentation.

119.

Defendant was aware of and had approved the presentation when it was initially presented in 2018.

120.

Defendant does not have any policy that would have required employees like Mr. Oliver to obtain advance approval before making such a presentation.

121.

Yet, on November 23, 2020, Director Landon questioned Mr. Oliver and asked him to explain how Defendant had been represented in the webinar and how the presentation impacted Defendant's clients.

122.

Mr. Oliver responded to Director Landon's questions, and he clarified that that he had been asked to do it last minute, it was on a day off, and he had not used any time that he should have been working to develop the presentation.

123.

When Mr. Oliver asked to meet with Director Landon about the presentation, the supervisor declined, saying that there was no need to go back and forth and that it could be discussed at a later time.

124.

Director Landon had asked Mr. Oliver about the status of a certain project several times over the course of the prior several months. Mr. Oliver repeatedly assured Director Landon that it would be completed on time.

125.

Indeed, Mr. Oliver completed the project before the deadline and emailed it to Director Landon on the afternoon of November 25, 2020.

126.

After several hours, Director Landon had not responded to Mr. Oliver's message about the project, and Mr. Oliver noticed that his coworkers were not logged into Microsoft teams. Later, Mr. Oliver learned from a coworker that Director Landon had told every other employee that they should leave early since Thanksgiving was the following day.

127.

Director Landon intentionally failed to communicate this message to Mr. Oliver and let him off early.

128.

On Monday, November 30, 2020, the first business day after the Thanksgiving holiday, Defendant notified Mr. Oliver that he was being terminated.

129.

As Executive Director Burns wrote, Mr. Oliver's final offense was that he participated in the November 20, 2020 presentation without Defendant's knowledge. According to the Executive Director, Mr. Oliver violated one of his job duties of keeping Director Landon and Executive

Director Burns informed of all current and proposed projects, as well as employee's obligation to be "Dependable and Trustworthy," as provided in the Employee Handbook.

130.

In a Georgia Department of Labor Separation Notice, Executive Director Burns said that the reason for the termination was that Mr. Oliver "[presented] at a Webinar on behalf of [Defendant] without the permission of his Department Head or Executive Director, which is a violation of [Defendant's] policy."

131.

Executive Director Burns did not reference the policy that Mr. Oliver allegedly violated in the Separation Notice.

132.

Executive Director Burns did not reference a specific policy in the Separation Notice because such policy does not exist.

133.

Executive Director Burns further explained that, since Mr. Oliver was being terminated, he was ineligible to receive any of his accrued paid time off.

134.

As Executive Director Burns had indicated in his termination notice, Defendant left all of Mr. Oliver's belongings outside of the building for Mr. Oliver to pick up, and Defendant refused to meet with Mr. Oliver to discuss the termination or even allow him into the building.

135.

The reasons that Executive Director Burns provided for Mr. Oliver's termination are not legitimate.

136.

The reasons that Executive Director Burns provided for Mr. Oliver's termination are pretextual.

137.

Defendant terminated Mr. Oliver's employment because of Mr. Oliver's disability.

138.

Defendant terminated Mr. Oliver's employment because Mr. Oliver had requested, on numerous occasions, reasonable accommodations for his disability.

139.

Defendant terminated Mr. Oliver's employment because he had made internal complaints concerning the harassment that he had experienced, Defendant's violation of Mr. Oliver's right to privacy over his medical information and to be free of improper medical inquiries, and failure and refusal to provide a reasonable accommodation.

140.

Defendant terminated Mr. Oliver's employment because he filed a Charge of Discrimination with the EEOC.

141.

Executive Director Burns decided to terminate Mr. Oliver's employment because he was offended that Mr. Oliver had been the first person to file a charge of discrimination against Defendant in approximately 57 years, and because Mr. Oliver had made specific complaints concerning the Executive Director's conduct.

142.

In light of Mr. Oliver's five-year tenure working for Defendant, the fact that Mr. Oliver was terminated approximately one month after Defendant submitted a Position Statement in response to the EEOC Charge strongly suggests that Mr. Oliver was fired because he filed the complaint.

143.

Even if Mr. Oliver's actions that resulted in him being fired were a violation of Defendant's policies, it did not rise to the level of misconduct warranting his discharge under Defendant's policies or practices.

144.

In addition to his loss of income and benefits, Defendant's termination "for cause" of Mr. Oliver caused him to have to forfeit approximately 95 hours of paid time off that he had accrued, and should have otherwise been paid at his separation.  Mr. Oliver had almost worked for Defendant long enough to be eligible for Defendant to match contributions to Mr. Oliver's retirement fund with the Georgia Municipal Employee Benefit System.

Procedural Background

145.

After making initial contact with the Equal Employment Opportunity Commission several months earlier, Mr. Oliver submitted his Form 5 Charge of Discrimination to the EEOC on September 18, 2020.  In his Charge of Discrimination, Mr. Oliver alleged that he had been subjected to discrimination and harassment due to disability and retaliation in violation of the Americans with Disabilities Act on an ongoing basis from December 2019 through the present. The EEOC assigned Mr. Oliver's Charge Number 415-2020-01000.

146.

Defendant had notice of Mr. Oliver's Charge of Discrimination and participated in the proceedings before the EEOC.

147.

Critically, in Mr. Oliver's Rebuttal to Defendant's Position Statement that he submitted sometime around December 5, 2020, Mr. Oliver explained that he had been terminated several days earlier, he believed the termination was because of his participation in the EEOC's investigation and his filing of a Charge of Discrimination based on disability, and that the reason provided by Defendant was pretextual.  Mr. Oliver also asked that his Charge be amended to include his claim for retaliation for filing a Charge. Accordingly, Mr. Oliver's claim that his termination had been retaliatory was a part of his first Charge and the investigation.

148.

On March 26, 2021, the EEOC issued its Dismissal and Notice of Rights, and Mr. Oliver received it sometime thereafter.

149.

Mr. Oliver has exhausted his administrative remedies as to his first Charge of Discrimination, and he is filing the instant action within ninety days of the EEOC's issuance and his receipt of a Dismissal and Notice of Rights.

150.

Despite Mr. Oliver alleging that his termination had been retaliatory in his first Charge, in an abundance of caution, Mr. Oliver submitted a second Charge of Discrimination to the EEOC on May 28, 2021, alleging that on November 30, 2020, Defendant had retaliated against him for

complaining internally of Defendant's failure to accommodate his disability and for filing a Charge of Discrimination in violation of the Americans with Disabilities Act.

151.

Mr. Oliver requested that the EEOC issue a Right to Sue letter upon receipt of his Second Charge, which Mr. Oliver has yet to receive.

**COUNT I:**
**DISCRIMINATION BASED ON DISABILITY**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

152.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 151, as if the same were set forth herein.

153.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

154.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

155.

As alleged herein, Plaintiff was employed with Defendant for approximately five years and served in the role of Senior Planner II. Plaintiff was performing his duties in that role, and he is otherwise qualified and able to perform the essential functions of his job, with or without a reasonable accommodation.

156.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities.

157.

Specifically, Plaintiff suffers from an underlying physiological disorder that has contributed to him being diagnosed with morbid obesity. Morbid obesity is a physical impairment that results in spatial limitations due to a person's size and weight, decreased stamina and fatigue, overall weakness, and difficulty with walking and mobility.  This medical condition is also a direct cause of other conditions Plaintiff experiences such as sleep apnea and high blood pressure.  This medical condition has also resulted in Plaintiff being more susceptible to other diseases, as well as being higher risk of developing serious complications if infected by the COVID-19 virus.

158.

As alleged herein, the aforementioned medical conditions, alone or in the aggregate, substantially limit Plaintiff's major life activities.

159.

Defendant was aware of Plaintiff's disabilities.

160.

Beginning in 2019, and continuing until his termination, Defendant discriminated against Plaintiff by refusing to consider or provide Plaintiff with a promotion solely on the basis of Plaintiff's disabilities.

161.

Beginning in December 2019, and continuing until his termination, Defendant discriminated against Plaintiff by harassing Plaintiff and creating a hostile work environment.

Specifically, a nonsupervisory coworker threatened Plaintiff with physical violence on a number of occasions and Plaintiff's supervisors mocked and belittled Plaintiff.  Moreover, the conduct directed at Plaintiff was specifically because of his disabilities. As alleged herein, Plaintiff was offended by the conduct, and the conduct at issue is considered objectively offensive. Plaintiff complained to his supervisors and human resources concerning his coworker's conduct, but Defendant failed to take any measures to address the harassment.  Moreover, Plaintiff's supervisors were responsible for some of the conduct at issue. As a result, there is a basis for Defendant's liability.

162.

Beginning on or around March 17, 2020, and continuing through his termination, Defendant discriminated against Plaintiff by attempting to force Plaintiff on leave that he did not request or need, solely on the basis of Plaintiff's disabilities.

163.

Beginning on or around March 30, 2020, Defendant discriminated against Plaintiff by refusing to allow Plaintiff to attend and present at a conference in October 2020 solely on the basis of Plaintiff's disabilities.

164.

Beginning on or around March 30, 2020, Defendant discriminated against Plaintiff by refusing to allow Plaintiff to attend and present at a conference in October 2020 solely on the basis of Plaintiff's disabilities.

165.

On or around November 30, 2020, Defendant subjected Plaintiff to discrimination by terminating Plaintiff's employment solely because of Plaintiff's disabilities.

166.

Plaintiff has been injured by Defendant's discrimination based on disability, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including compensatory damages, reinstatement, backpay, injunctive relief, punitive damages, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

## COUNT II:
## DISCRIMINATION BASED ON DISABILITY
## IN VIOLATION OF THE REHABILITATION ACT

167.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 151, as if the same were set forth herein.

168.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

169.

Defendant, as a program receiving Federal financial assistance both directly and indirectly from the United States government, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

170.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

171.

For the reasons set forth in Count I, *supra*, and expressly incorporated herein, Defendant subjected Plaintiff to discrimination based on disability.

172.

Plaintiff has been injured by Defendant's discrimination due to disability, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

**COUNT III:**
**FAILURE TO PROVIDE A REASONABLE ACCOMMODATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

173.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 151, as if the same were set forth herein.

174.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

175.

Discrimination based on disability includes an employer's failure to make a "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

176.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

177.

As alleged herein, Plaintiff was employed with Defendant for approximately five years and served in the role of Senior Planner II.  Plaintiff was performing his duties in that role, and he is otherwise qualified and able to perform the essential functions of his job, with or without a reasonable accommodation.

178.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities.

179.

Specifically, Plaintiff suffers from an underlying physiological disorder that has contributed to him being diagnosed with morbid obesity. Morbid obesity is a physical impairment that results in spatial limitations due to a person's size and weight, decreased stamina and fatigue, overall weakness, and difficulty with walking and mobility.  This medical condition is also a direct cause of other conditions Plaintiff experiences such as sleep apnea and high blood pressure.  This medical condition has also resulted in Plaintiff being more susceptible to other diseases, as well as being higher risk of developing serious complications if infected by the COVID-19 virus.

180.

As alleged herein, the aforementioned medical conditions, alone or in the aggregate, substantially limit Plaintiff's major life activities.

181.

Defendant was aware of Plaintiff's disabilities.

182.

Beginning on March 16, 2020, Plaintiff requested a reasonable accommodation in the form of teleworking as result of Plaintiff's medical condition and disabilities.

183.

Defendant initially failed and refused to consider Plaintiff's request for a reasonable accommodation and Defendant explicitly denied Plaintiff's request, forcing Plaintiff to take leave that he did not need.

184.

The accommodations requested by Plaintiff remained available, would have been effective, and would not have posed an undue hardship on Defendant.

185.

On March 31, 2020, Defendant said that it was granting the reasonable accommodation requested by Plaintiff.  However, Defendant only allowed Plaintiff to telework at the time that it allowed all of its employees to telework because of the pandemic, without regard to each employee's medical condition.

186.

As a result, on March 31, 2020, Defendant did not actually grant Plaintiff's request for a reasonable accommodation.

187.

Once Defendant allowed its employees to telework, Plaintiff requested a reasonable accommodation in the form of being permitted to take an office chair, which had been specially

ordered for Plaintiff due to his medical condition, home during the period of telework.  Defendant also told Plaintiff that, if he was lacking a comfortable chair, he could take time off.

188.

The accommodations requested by Plaintiff remained available, would have been effective, and would not have posed an undue hardship on Defendant.

189.

Beginning in May 2020, Plaintiff requested a reasonable accommodation for his disabilities in the form of being permitted to continue teleworking.

190.

On several subsequent occasions, Defendant initially denied Plaintiff's requested accommodation, required Plaintiff to provide more documentation that was necessary in support of his request, and advised Plaintiff that he could take leave since his request was being denied.

191.

The accommodations requested by Plaintiff remained available, would have been effective, and would not have posed an undue hardship on Defendant.

192.

In denying the aforementioned accommodations requested by Plaintiff, Defendant failed to engage in the interactive process to explore other accommodations that may have been available.

193.

Plaintiff has been injured by Defendant's discrimination based on disability due to its failure to provide a reasonable accommodation, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including compensatory damages, reinstatement,

backpay, injunctive relief, punitive damages, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

## COUNT IV:
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
## IN VIOLATION OF THE REHABILITATION ACT

194.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 151, as if the same were set forth herein.

195.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

196.

Defendant, as a program receiving Federal financial assistance both directly and indirectly from the United States government, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

197.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

198.

For the reasons set forth in Count III, *supra*, and expressly incorporated herein, Defendant discriminated against Plaintiff based on disability due to its failure to provide a reasonable accommodation.

199.

Plaintiff has been injured by Defendant's discrimination due to its failure to provide a reasonable accommodation, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

## COUNT V:
## RETALIATION
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

200.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 151, as if the same were set forth herein.

201.

The Americans with Disabilities Act prohibits covered entities from discriminating against any individual because such individual has opposed any act or practice made unlawful by the Americans with Disabilities Act or because said individual has filed a Charge of Discrimination. 42 U.S.C. § 12203(a).

202.

The Americans with Disabilities Act prohibits covered entities from coercing, threatening or interfering with any individual in the exercise or enjoyment of her rights under the Americans with Disabilities Act.  42 U.S.C. § 12203(b).

203.

Beginning on March 16, 2020, Plaintiff attempted to exercise his rights provided by the Americans with Disabilities Act by requesting a reasonable accommodation for Plaintiff's disabilities.  Specifically, Plaintiff requested that he be permitted to telework because his disabilities cause him to be at higher risk of serious disease if infected by COVID-19.

204.

After Defendant received Plaintiff's request for a reasonable accommodation, Defendant retaliated against Plaintiff by subjecting him to additional harassment and denying his request for a reasonable accommodation, solely on the basis that he had engaged in said protected activity.

205.

On March 31, 2020, after Defendant sent most of its employees home to telework, Plaintiff attempted to exercise his rights provided by the Americans with Disabilities Act by requesting a reasonable accommodation for his disabilities.  Specifically, Plaintiff requested that he be allowed to take the chair in his office, that Defendant ordered specifically because of Plaintiff's disability, home so that he would be able to telework.

206.

After Defendant received Plaintiff's request for a reasonable accommodation, Defendant retaliated against Plaintiff by subjecting him to additional harassment, denying his request for a reasonable accommodation, and reprimanding Plaintiff for attempting to obtain information about the specially ordered chair, solely on the basis that he had engaged in said protected activity.

207.

Beginning on June 9, 2020, Plaintiff expressed his opposition to Defendant's discriminatory conduct by filing an internal complaint with Defendant's human resources department concerning Defendant's denial of Plaintiff's requests for a reasonable accommodation and other rights provided by the Americans with Disabilities Act and the harassment that Plaintiff experienced from his coworkers and supervisors because of his disabilities.

208.

When Defendant became aware that Plaintiff had submitted an internal complaint concerning the discrimination and harassment that Plaintiff had experienced, Defendant retaliated against Plaintiff by subjecting him to additional harassment, denying Plaintiff's request to extend his telework, cutting off Plaintiff's electronic access to Defendant's tools an files, requiring Plaintiff to return all of his work-related equipment, attempting to force Plaintiff to take leave that he did not need, subjecting Plaintiff to scrutiny and policies that only applied to him, taking away Plaintiff's projects and ability to respond to press inquiries, and forcing Plaintiff to change his vacation plans, solely on the basis that he had engaged in the protected activity of opposing Defendant's discriminatory practices.

209.

In Summer 2020, Plaintiff made initial contact with the Equal Employment Opportunity Commission, and Plaintiff formally filed a Charge of Discrimination with the EEOC on September 21, 2020, alleging that he had been discriminated against because of his disability.

210.

When Defendant became aware that Plaintiff had filed a Charge of Discrimination, alleging discrimination based on disability, Defendant retaliated against Plaintiff by subjecting him to additional harassment and ultimately terminating Plaintiff's employment in a manner that was intended to ensure that Plaintiff would not receive benefits that he would have otherwise been entitled but for a termination for cause, solely on the basis that he had engaged in the protected activity of filing a Charge of Discrimination.

211.

Plaintiff has been injured by Defendant's retaliatory conduct, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including compensatory damages, reinstatement, backpay, injunctive relief, punitive damages, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

## COUNT VI:
## RETALIATION
## IN VIOLATION OF THE REHABILITATION ACT

212.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 151, as if the same were set forth herein.

213.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency..." 29 U.S.C. § 794(a).

214.

Defendant, as a program receiving Federal financial assistance both directly and indirectly from the United States government, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

215.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

216.

For the reasons set forth in Count V, *supra*, and expressly incorporated herein, Defendant subjected Plaintiff to retaliation after she engaged in activities protected by the Americans with Disabilities Act.

217.

Plaintiff has been injured by Defendant's retaliation, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

## COUNT VII:
## FAILURE TO PAY OVERTIME PAY
## IN VIOLATION OF THE FAIR LABOR STANDARDS ACT

218.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 151, as if the same were set forth herein.

219.

Under the Fair Labor Standards Act, an employer must pay a rate of not less than one and one-half times an employee's regular rate for any time worked in excess of forty hours for any given workweek.  *See* 29 U.S.C. § 201(a)(1).

220.

As alleged herein, Defendant and Plaintiff are covered, non-exempt employer and employee under the Fair Labor Standards act, respectively.  *See* 29 U.S.C. § 201(a)(1).

221.

While Defendant classified Plaintiff's position as exempt, Plaintiff's actual job duties will reflect the fact that Plaintiff's position should have been classified as non-exempt from overtime.

222.

As alleged herein, Plaintiff frequently worked in excess of forty hours per workweek.

223.

Defendant was aware of the fact that Plaintiff worked in excess of forty hours per workweek.

224.

However, Defendant failed to compensate Plaintiff for any hours in excess of forty per workweek at the appropriate overtime rate.

225.

Defendant's conduct, as alleged herein, constitutes failing to provide overtime pay in violation of the Fair Labor Standards Act.

226.

Plaintiff has been injured by Defendant's actions and is entitled to an award of unpaid overtime compensation and all other damages allowed under the Fair Labor Standards Act for the period preceding two years prior to the filing of this act, as well as reasonable attorney's fees and costs of litigation to be paid by Defendant pursuant to 29 U.S.C. § 216(b), in an amount to be proven at trial.

227.

The evidence will reflect the fact that Defendant willfully violated the Fair Labor Standards Act when it failed to compensate Plaintiff at the appropriate rate of overtime, and thus, Plaintiff should be permitted to recover all damages listed in the preceding paragraph for the period of three years prior to the filing of this action.

228.

Moreover, Defendant has acted in bad faith and did not have reasonable grounds to believe that its actions were not a violation of the Fair Labor Standards Act.

229.

This Court should exercise its sound discretion to award liquidated damages pursuant to 29 U.S.C. § 260, and should award to Plaintiff said liquidated damages in an amount equal to an award for unpaid overtime compensation.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Russell G. Oliver respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant Coastal Regional Commission of Georgia, and that Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff on Count I for discrimination based on disability, including for subjecting Plaintiff to harassment and a hostile work environment, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

4)      That judgment be awarded for and in favor of Plaintiff on Count II for discrimination based on disability, including for subjecting Plaintiff to harassment and a hostile work environment, and grant Plaintiff all relief allowable under the Rehabilitation Act of 1973;

5)      That judgment be awarded for and in favor of Plaintiff on Count III for discrimination based on disability because of Defendant's failure to provide a reasonable accommodation and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

6)      That judgment be awarded for and in favor of Plaintiff on Count IV for discrimination based on disability because of Defendant's failure to provide a reasonable accommodation and grant Plaintiff all relief allowable under the Rehabilitation Act of 1973;

7)      That judgment be awarded for and in favor of Plaintiff on Count V for retaliation and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

8)      That judgment be awarded for and in favor of Plaintiff on Count VI for retaliation and grant Plaintiff all relief allowable under the Rehabilitation Act of 1973;

9)      That judgment be awarded for an in favor of Plaintiff on Count VII for failure to pay overtime and grant Plaintiff all relief allowable under the Fair Labor Standards Act, including liquidated damages, and attorney's fees and costs of litigation; and,

10)     For such other relief as this Court shall seem just and proper.

Respectfully submitted, this 24th day of June, 2021.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com